(April 2, 1921.)

## J. S. HATCHER and W. A. SNYDER, Copartners Doing Business Under the Firm Name and Style of HATCHER & SNYDER, Appellants, v. BARLOW FERGUSON, Respondent.

[198 Pac. 680.]

SALE AND DELIVERY OF PERSONAL PROPERTY—EMBARGO—BREACH OF CONTRACT—CONSTRUCTION OF "F. O. B. CARS."

1. Under the facts of this case, *held*, that delivery of lambs on board cars billed to Shoshone, Idaho, without cost to the appellants, was a compliance with the respondent's contract.

2. The refusal of the railroad company to bill lambs to an eastern market did not justify appellants' refusal to receive such lambs when loaded on cars, even though they could at that time be billed only to Shoshone, Idaho.

3. *Held*, in this case that respondent's contract to deliver lambs at Ketchum "f. o. b. cars" placed upon him no obligation to guarantee their shipment to a particular market.

APPEAL from the District Court of the Fourth Judicial District, for Lincoln County. Hon. James R. Bothwell, Judge.

Action for damages. Appeal from judgment for defendant. *Affirmed.*

W. G. Bissell and Pierce, Critchlow & Barette, for Appellant.

"If a party by his contract charge himself with an obligation possible to be performed, he must make it good, unless his performance is rendered impossible by the act of God, the law, or the other party. Difficulties, even if unforeseen, and however great, will not excuse him." (*United States v. Gleason*, 175 U. S. 588, 20 Sup. Ct. 228,

3. Delivery of goods to carrier for shipment f. o. b. as delivery to purchaser, see notes in 20 **Ann. Cas.** 1036; **Ann. Cas.** 1916A, 1049.

44 L. ed. 284, sec, also, Rose's U. S. Notes; 6 R. C. L. 365; *Malcolmson v. Wapoo Mills*, 88 Fed. 680; *Danenhower v. Hayes*, 35 App. D. C. 65, 33 L. R. A., N. S., 65, 698; *City of Covington v. Kanawha Coal & C. Co.*, 121 Ky. 681, 123 Am. St. 219, 12 Ann. Cas. 311, and note, 89 S. W. 1126, 3 L. R. A., N. S., 248.)

By virtue of the term · "f. o. b. cars at Ketchum," defendant was obligated to load the lambs on board cars subject to such billing as plaintiffs might direct (*Hurst v. Altamont Mfg. Co.*, 73 Kan. 422, 117 Am. St. 525, 9 Ann. · Cas. 549, 85 Pac. 551, 6 L. R. A., N. S., 928; *Vogt v. Schienebeck*, 122 Wis. 491, 106 Am. St. 989, 2 Ann. Cas. 814, 100 N. W. 820, 67 L. R. A. 756; *Hunter Bros. Milling Co. v. Kramer Bros.*, 71 Kan. 468, 80 Pac. 963; *John O'Brien Lumber Co. v. Wilkinson*, 117 Wis. 468, 94 N. W. 337; *Culp v. Sandoval*, 22 N. M. 71, 159 Pac. 956, L. R. A. 1917A, 1157; *Sheffield Furnace Co. v. Hull Coal & Coke Co.*, 101 Ala. 446, 14 So. 672.)

The embargo being a temporary one, the execution of the contract by both parties was not excused or rendered impossible, but merely suspended, and either party had the right to call upon the other for substantial performance at the earliest possible date. (6 R. C. L. 1001; *American Mercantile Exchange v. Blunt*, 102 Me. 128, 120 Am. St. 463, 10 Ann. Cas. 1022, and note, 66 Atl. 212, 10 L. R. A., N. S., 414; *Odlin v. Insurance Co. of Pennsylvania*, 2 Wash. C. C. 312, 18 Fed. Cas. (No. 10,433) 585; *Baylies v. Fettyplace*, 7 Mass. 325; *Board of Education v. Townsend*, 63 Ohio St. 514, 59 N. E. 223, 52 L. R. A. 868; *School District v. Howard*, 5 Neb. Unof. 340, 98 N. W. 666.)

J. G. Hedrick, P. S. Haddock and Barlow Ferguson, for Respondent.

The language "f. o. b" or a similar phrase in a contract with reference to the sale and shipment of goods *prima facie* imposes on the purchaser the duty of furnishing or designating the cars or other vehicles by which the goods are to be shipped. (*Baltimore & L. R. Co. v. Steel Rail*

*Supply Co.,* 123 Fed. 655, 59 C. C. A. 419; *Evanston Elevator & Coal Co. v. Castner,* 133 Fed. 409; *Davis v. Alpha Portland Cement Co.,* 134 Fed. 274; Id., 142 Fed. 74, 73 C. C. A. 388; *Consolidated Coal Co. v. Schneider,* 163 Ill. 393, 45 N. E. 126; *Consolidated Coal Co. v. Jones & Adams Co.,* 120 Ill. App. 139; *Kunkle v. Mitchell,* 56 Pa. St. 100; *Hocking v. Hamilton,* 158 Pa. St. 107, 27 Atl. 836; *Lozes v. Segura Sugar Co.,* 52 La. Ann. 1844, 28 So. 249; *Vredenburg v. Baton Rouge Sugar Co.,* 52 La. Ann. 1666, 28 So. 122; *Dwight v. Eckert,* 117 Pa. 490, 12 Atl. 32; 35 Cyc. 197; *Culp v. Sandoval,* 22 N. M. 71, 159 Pac. 956, L. R. A. 1917A, 1157.)

"F. O. B."—An abbreviation of free on board, used in executing contracts of sale and indicating that delivery on the vessel or conveyance of a carrier is to be without expense to the buyer. (Century Dictionary.)

It did not need any bill of lading to consummate the transaction. (*Congdon v. Kendall,* 53 Neb. 282, 73 N. W. 659.)

"Where a buyer of ewes refuses to accept a tender of performance by a seller and renounces the contract, he could not thereafter claim that the seller was bound to keep the sheep for the buyer's benefit at the peril of incurring the obligation to refund advance payments made by the buyer." (*Clifton v. Willson,* 47 Mont. 305, 132 Pac. 424.)

"Where a payment was to be made on delivery, the purchaser in an action for nondelivery must show that he was able, ready, and willing to pay." (24 Am. & Eng. Ency. 1150 and cases; 35 Cyc. 620.)

DUNN, J.—This action was brought by the plaintiff against the defendant for $3,979.40, alleged to be the difference, on the first day of September, 1916, between the contract price of 4,140 lambs and the market value thereof on said date, and also for the sum of $2,070 theretofore paid defendant by plaintiffs on the following contract:

## "SHEEP BILL OF SALE.

"June 17th, 1916.

"This is to certify that I have this day sold to Hatcher & Snyder not less than 6400 head of unshorn lambs out of my flocks, 15 days notice, sellers option at the price of 8¢ per pound to be delivered F. O. B. cars at Ketchum between the 1st day of August, 1916, and the 1st day of September, 1916. Said lambs to be free of body wrinkles, from scab and all other diseases. I further agree that I will not top my herds before making delivery of this contract. At time delivery is made the lambs to be in good merchantable condition, to have dry fleeces and the minimum weight of any lamb on this sale shall not be less than 60 pounds after the same has been in a dry corral without feed and water for at least twelve hours.

"Received on this bill of sale, as part payment, the sum of $3200.00 Dollars, balance to be paid when delivery is completed.

"——— old ewes, (shell to be thrown out) at ——— per ———.

"——— cull lambs, (Nothing under forty pounds) at ——— per ———.

"Both subject to conditions named in contract above.

"BARLOW FERGUSON."

A similar action was brought at the same time by the same plaintiffs on the same kind of contract against J. W. Newman for $3,584.10, which plaintiffs alleged to be the difference on September 1st, 1916, between the contract price of 4,404 lambs and the market value thereof on said date, and also for the sum of $2,200 theretofore advanced to defendant Newman by plaintiffs on said lambs.

The cases were tried together before the same jury and separate verdicts returned in favor of the defendants. Judgment was entered thereon and the plaintiffs have appealed.

The appellants have specified twenty-five errors, the first and second of which are that the verdict is not sustained by sufficient evidence or any evidence, and that the verdict

and judgment are contrary to the law. All the others are based upon the giving or refusing of certain instructions by the court. It will not be necessary to examine these alleged errors singly, for the issue to be determined by this court is conceded by counsel on both sides to be limited to the question whether or not there was delivery of the lambs as provided for by the contract. Incidental to and bearing upon the question of delivery is the construction of the expression, "f. o. b. cars," as used in the contract, and also the question whether the respondent had a right under the contract to demand payment in cash, as he is alleged by the appellants to have done.

The sole question to be determined by the jury in this case was whether the respondent had complied with his contract in delivering to the appellants at Ketchum, Idaho, f. o. b. cars on August 31, 1916, the remaining 4140 head of lambs covered by the contract set up in the complaint.

As to the meaning of the expression "f. o. b. cars," the court instructed the jury as follows: "The court instructs the jury that the abbreviation f. o. b. as used in the contract dated June 17, 1916, and read to you in evidence in this case means 'free on board' and indicates that the property purchased shall be delivered on board the cars without expense to the buyer at the point designated in the contract."

Bouvier's Law Dictionary defines "free on board" as: "A phrase applied to the sale of goods which denotes that the seller has contracted for their delivery on the vessel, car, etc., without cost to the buyer for packing, portage, cartage, and the like."

The instruction given by the court substantially conforms to the definition last above quoted and correctly states the law so far as this contract is concerned.

There was little conflict in the evidence, and we are of the opinion that the instructions given by the court sufficiently covered the case to enable the jury to clearly understand the issue and to decide it according to the evidence, and a careful examination of the record convinces us that

their conclusion was correct. We have examined the other instructions given to the jury, as well as those requested by appellants and refused, and we are of the opinion that there was no reversible error committed by the court either in the giving or refusing of instructions.

Much attention has been paid by counsel in their briefs to a discussion of the question as to whose duty it was under this contract to obtain the cars for the shipment of the lambs, but we are of the opinion that no such question arises in this case. It appears that cars for the shipment of the lambs were furnished at the request of the respondent. No default in that regard is charged, so it is immaterial whose duty it was to furnish them.

The respondent was at Ketchum in person when the lambs were delivered there and was present at the loading of the cars. The appellants were represented by Otto J. Hatcher and James R. Hatcher, son and nephew respectively of one of the appellants. These agents were in communication with the appellants at Denver, Colorado, and numerous telegrams passed back and forth between them and their principals on August 30th and 31st. The only difficulty in the way of an amicable handling of the lambs was the fact that on August 30th, when the lambs were about ready to be loaded, word came to the railroad agent at Ketchum that owing to an embargo which had that day been placed on shipments east, no livestock would be received by the railroad company for shipment to any point unless delivery at destination could be made on or before noon September 2d. This embargo was due to a threatened strike of the railroad employees all over the system. The question then arose between the respondent and the agents of the appellants whether the appellants would receive the lambs that were then about to be loaded on the cars. It was the desire of the appellants that shipment should be made to some eastern market, probably Chicago, and both the respondent and the appellants' agents appear to have made every possible effort to induce the railroad company to accept shipment of the lambs to such eastern

market, but without avail. The appellants' agents assisted in and superintended most of the loading, apparently undecided whether the lambs would finally be accepted or not. It appears from the testimony of some witnesses that at one time the respondent was advised by Otto J. Hatcher, who was in charge of the appellants' interests, that he would accept the lambs notwithstanding the embargo, but later, when they were almost completely loaded on the cars, according to his own testimony he announced to the respondent that he would not accept them.

It is undisputed that at Ketchum there was no supply of feed to be had by which it would be possible to keep the lambs any length of time, so that when it was determined that they could not be shipped to an eastern market, it became necessary that they should be taken from Ketchum to some point at which feed could be had for them, for at that time it was unknown either to appellants or respondent how long the embargo would continue. In making shipment from Ketchum the only place to which the railroad company would bill the lambs was Shoshone, Idaho, and in order to get the privilege of loading them on the cars respondent was compelled to bill them to that point. We are unable to see, however, how the appellants were prejudiced by this contract made by the respondent with the railroad company. Their agents had apparently exerted every possible effort to have the lambs shipped to some point farther east, but without success. If appellants had accepted the lambs they could have done nothing with them but ship them to Shoshone. Their inability to ship beyond that point could not by any means have been legally charged to respondent.

The aim of appellants in this case has been to show that the contract imposed upon the respondent the burden of billing the lambs to an eastern market, and that in the absence of such billing, delivery according to contract was not possible, but we think no such construction can fairly be placed upon said contract. There is in the contract nothing that would warrant this construction, and the evidence shows

no agreement outside of the contract by which the respondent was to become in any sense responsible for the destination of the lambs. When he loaded them on the cars at Ketchum without expense to the buyer he discharged the obligation of his contract, and the fact that the buyers were unable on account of the embargo to ship farther than Shoshone was not sufficient reason for them to refuse to accept the lambs and pay for them.

The appellants also complain because of the refusal of the defendant to accept in payment for said lambs a draft on Hatcher & Snyder at Denver. Their claim is that at the time of the previous shipment of a part of the lambs included in the contract payment was made by means of such a draft, and that if respondent intended at this time to refuse payment in the same manner, it was his duty to give them timely notice in order that cash might be provided at the remote point of Ketchum. Under all the circumstances surrounding this transaction we think the appellants have no ground to complain of this action of the respondent. The situation at the time of the delivery of these lambs at Ketchum was quite extraordinary, and it is not strange that after the controversy arose over the acceptance of the lambs the respondent should be somewhat doubtful as to the propriety of delivering 4,000 head of lambs to the appellants with nothing more certain in the way of payment than a draft on appellants. The evidence shows, however, that the respondent did not stand upon a demand for cash alone.

On the evening of August 30th, J. R. Hatcher, one of appellants' agents, wired W. A. Snyder, one of the appellants, as follows: "Ferguson requests that you have bank wire him that draft amounting to sixty thousand will be honored."

Instead of having his bank wire Ferguson that it would honor drafts on appellants amounting to $60,000, Snyder himself on the same day wired this reply to Ferguson: "I will pay all drafts drawn on me by Otto J. Hatcher, and

if you doubt my responsibility kindly wire United States National or Hamilton National Bank of this City.''

The request of the defendant that he be given the bank's assurance that the draft on plaintiffs for $60,000 would be honored was perfectly reasonable under the circumstances, and it is no reflection upon the financial responsibility of Mr. Snyder to say that the respondent in such a situation had a right to reject Mr. Snyder's personal assurance that he would pay and to insist upon a guaranty from Mr. Snyder's bank. In the absence of the guaranty that respondent asked as to the payment of the draft on appellants, we think he was fully warranted in refusing to accept anything in payment except cash.

A careful examination of the record in this case convinces us that there was not only sufficient evidence to warrant the verdict and judgment, but that a verdict and judgment in favor of the appellants would have been clearly against the evidence, which abundantly establishes the fact that delivery was made by the respondent to the appellants according to the terms of the contract set out in the complaint, and that appellants refused to accept.

The appellants contend that it was the duty of the respondent on September 2d, after the embargo had been lifted, to deliver these lambs according to the terms of the contract, but the appellants had had their opportunity to accept them; they had defaulted by absolutely refusing to accept them when they were tendered, and they have no right now to complain because the respondent, after having been compelled to take the risk of holding them indefinitely during the existence of the embargo, refused to deliver them after the embargo was lifted. At the time of the refusal of appellants to accept the lambs according to the terms of the contract they knew that it was easily possible that before these lambs could be shipped to market the respondent might be compelled to expend in their care a sum far in excess of the amount of the deposit that he held. Knowing these facts, appellants refused to perform their part of the contract and to assume the burden of caring

for the lambs during the embargo, a burden which clearly belonged to them and not to the respondent.

The judgment is affirmed, with costs to the respondent.

Rice, C. J., and Budge and McCarthy, JJ., concur.

LEE, J., Dissenting.—I cannot concur in the majority opinion. As stated therein, the material facts are not in controversy, and are substantially as follows: On June 17, 1916, respondent contracted to sell to appellants not less than 6,400 head of unshorn lambs out of his flocks, 15 days' notice, seller's option, at 8¢ per pound, to be delivered f. o. b. cars at Hill City or Ketchum, Idaho, between August 1 and September 1, 1916, and received an advance payment on the purchase price of $3,250, balance to be paid on delivery. On August 24th respondent delivered to appellants 2,260 head of these lambs at Ketchum, and having notified appellants that he would deliver the remainder on August 31st, he drove them to the stockyards at Ketchum for that purpose. Appellants, by their agents, Otto and James Hatcher, were there to receive these lambs at that time and place. For both shipments respondent had ordered cars from the railroad company, he understanding that the lambs had been purchased for shipment to an eastern market. However, when this last shipment was ready for delivery on August 31st, the railroad company, because of a threatened strike, refused to accept the shipment or deliver cars to respondent unless he would sign an agreement to unload the lambs at Shoshone, the connecting way station on the main line, a short distance from the point of loading, which agreement he signed, and without which he could not have obtained the cars. Respondent now insists that this was a delivery under the terms of his contract, which gave him the option to deliver f. o. b. at Ketchum at any time during the month of August. That is, respondent contends, and the majority opinion sustains such contention, that he could under the terms of this agreement select the only day in the month in which cars

could not be obtained for a through shipment of these lambs to market, and that appellants' failure or refusal to accept them under these conditions worked a forfeiture of all of appellants' rights under the contract of purchase, and gave to respondent the right to retain the advance payment made on them in June of $2,070, and the loss of the advancement in price, amounting in all to approximately $6,000.

Respondent, when the contract was entered into and also when the first shipment was made, had accepted checks or drafts drawn upon appellants at Denver; but about the time that these lambs were loaded upon cars, he informed the young men representing the appellants that unless they would immediately accept these lambs, with this conditional bill of lading which required they be almost immediately unloaded, and pay him in cash or what he regarded as its equivalent, he would cancel the contract of purchase, forfeit the advance payment and keep the lambs, and that he had a lawful right to do so. Respondent was a lawyer of many years' experience in active practice. It should also be borne in mind that this transaction took place at a way station in the interior, where there were no banking facilities for handling a transaction of this magnitude, which, together with the Newman purchase of like nature, and which respondent was transacting, required approximately $60,000. Appellants, through their agents, succeeded in getting this amount placed in a bank at Hailey, on August 31st. In imposing this condition, respondent may have been within the terms of his contract in demanding payment in cash only, but it is so out of the ordinary, in a transaction of this kind, for a seller who has had previous similar transactions with the buyer, and has accepted his check or drafts, to demand cash under these conditions, that it evinces a purpose to prevent purchasers from carrying out their part of the agreement, so that the seller may claim a forfeiture.

The threatened railroad strike did not occur, and the carrier resumed shipment on September 2d, at which time

appellants again endeavored to secure a delivery of these lambs, which had been shipped to and unloaded at Gooding. Respondent refused delivery, retained the advance payment made in June, and deprived the appellants of the profits arising by reason of the advanced prices then prevailing.

The authorities are not in entire harmony as to whether it is the duty of the buyer or seller to furnish cars under a contract of this kind; but this is not material in this case, because in the former shipment and in this one, the seller actually did apply for and secure the cars, and all the authorities hold that where an agreement is not definite in this particular, that meaning will be given to it by the courts which the parties themselves have given it. (*District of Columbia v. Gallagher*, 124 U. S. 505, 8 Sup. Ct. 585, 31 L. ed. 526, see, also, Rose's U. S. Notes; *Davis v. Alpha Portland Cement Co.*, 142 Fed. 74, 73 C. C. A. 388; *Vermont Street M. E. Church v. Brose*, 104 Ill. 206, 209; *Consolidated Coal Co. v. Schneider*, 163 Ill. 393, 45 N. E. 126.)

Respondent claims that because these lambs were cut out of his herds and the remainder had been turned back upon the summer range, because of the insufficiency of feed for these lambs at Ketchum, he was compelled to accept these cars and agree to remove the lambs from the cars at a station a few miles beyond, and insist on appellants' acceptance of the delivery upon the terms he imposed. This appears to me to be a thinly disguised camouflage to justify his forfeiture of the payments made in June on the purchase price, and the enhanced value of these lambs, which, with his shipment and that of his son-in-law, Newman, for whom he was also acting, amounts to approximately $12,000. They were fully equipped for caring for sheep on the range, and Ketchum is near one of the most fertile irrigated regions in the state, so that respondent was not forced to this arbitrary course of action. The record shows that the appellants were engaged exclusively in buying and shipping f. o. b. cars for eastern markets, and were not

equipped for handling stock of this kind, or feeding or caring for them except in transit to the markets.

Under the facts disclosed by this record, the action of respondent in declaring this contract· forfeited, under all the circumstances, is so contrary to my conception of a fair standard of business integrity that I am unable to approve of it, and I do not think that a correct rule of law applied to these facts would permit him to forfeit this contract. It seems to me that it is a reproach to the law, and a reflection upon the administration of justice, to permit the seller to thus confiscate the property of a purchaser, who has been ready, willing and able to meet all the conditions of his contract of purchase, and who is prevented from doing so by shipping conditions imposed by the carrier, and which are entirely beyond his control. Neither party to this transaction was at fault for the refusal of the railroad company to accept these lambs for through shipment, and neither should be permitted to take advantage of the other by reason of such refusal on the part of the railroad company.

The majority opinion is to the effect that a vendor of livestock purchased for shipment to the market has complied with his agreement to deliver such stock f. o. b. cars when he delivers it upon cars, under an embargo of the carrier that requires such stock to be almost immediately unloaded and removed from such cars at a near-by way station. The rule is not applicable to the unusual conditions that existed in this case. No authorities are cited in its support, and I think that none can be found.

"The phrase 'f. o. b. cars,' when used in a contract between a buyer and a seller of commercial commodities, where the use of a common carrier is necessary, means that the seller will secure the cars, load them, and do whatever may be required to accomplish the shipment and consignment of the goods to the buyer, free of expense." (*Hurst v. Altamont Mfg. Co.*, 73 Kan. 422, 117 Am. St. 525, 9 Ann. Cas. 549, 85 Pac. 551, 6 L. R. A., N. S., 928; *John O'Brien Lumber Co. v. Wilkinson*, 117 Wis. 468, 94

N. W. 337; *Hunter Bros. Milling Co. v. Kramer Bros.*, 71 Kan. 468, 80 Pac. 963; *Culp v. Sandoval*, 22 N. M. 71, 159 Pac. 956, L. R. A. 1917A, 1157; *Vogt v. Schienebeck*, 122 Wis. 491, 106 Am. St. 989, 2 Ann. Cas. 814, 100 N. W. 820, 67 L. R. A. 756; 2 Words & Phrases, 658–660.)

For the foregoing reasons and upon the authorities cited, this judgment should be reversed.

(June 27, 1921.)

ON PETITION FOR REHEARING.

RICE, C. J.—Under the contract in this case, by which it was agreed that the lambs should be delivered f. o. b. cars at Ketchum, the carrier by which they were to be transported became the agent of the buyer to accept delivery. (*Griffin v. Edward Eiler Lumber Co.*, 122 Miss. 265, 84 So. 225.) It may be conceded that a reasonable construction of such contract requires the property to be loaded without expense to the buyer upon cars suitable for transportation. The contract, however, did not designate or contain any intimation as to the final destination of the shipment. The most that can be said is that it is reasonable to assume that it was understood by both parties that the intention was to ship to some eastern market. But where the contract provides for delivery f. o. b. cars, without any further provision as to transportation to a designated destination, the buyer and not the seller fixes the destination, and the buyer assumes the risk of refusal on the part of the carrier to bill the property to the destination which he desires. When the seller enters into a contract with the carrier for shipment to a particular destination, he does so at the request of the buyer and in designating the destination acts as the buyer's agent. He has done his duty when he demands of the carrier a shipping contract to the destination requested by the buyer. If any loss results from the refusal of the carrier to make a contract to deliver at the

desired destination, the loss must be borne by the buyer and not by the seller.

So far as a claim for forfeiture is concerned, we understand the law to be that the buyer cannot recover the price paid but will forfeit his advance payments if he wrongfully refuses to carry out the contract of sale, or wrongfully refuses to receive the goods when tendered. (35 Cyc. 605.)

The petition for rehearing is denied.

Budge, McCarthy and Dunn, JJ., concur.